Stephen Gerard **AGNITSCH**, Plaintiff,

v.

**PROCESS SPECIALISTS, INC.,**
a Texas corporation,
Defendant.

No. 4:03–CV–90256.

United States District Court,
S.D. Iowa,
Central Division.

May 24, 2004.

David A. Tank, Daniel M. Weddle, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for Plaintiff.

James E. Nervig, Brick Gentry Bowers Swartz Stoltze Schuling & Levis PC, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff Stephen Gerard Agnitsch filed this action on May 9, 2003 in order to enforce a judgment entered on June 23, 1998 against Defendant Process Specialists, Inc. ("PSI") by the High Court of Malaysia at Kuala Lumpur (Commercial Division) in favor of Plaintiff. Plaintiff seeks to enforce this judgment under the Iowa Uniform Foreign Money–Judgments Recognition Act, Iowa Code Chapter 626B. On August 12, 2003, Defendant PSI filed a Motion to Dismiss for failure to state a claim and for lack of personal jurisdiction.[1] This Court gave notice to the parties on December 9, 2003 that, pursuant to Federal Rule of Civil Procedure 12(b), Defendant's motion would be treated as one for summary judgment since matters outside the pleadings had been submitted for consideration of the Court by both parties. In the December 9th Order, the Court

---

1. As indicated in the Court's December 9, 2003 Order, Defendant's motion should have been styled only as a Rule 12(b)(6) motion, not a Rule 12(b)(2) motion, since the issue was not whether this Court had jurisdiction over the Defendant, but rather whether the Malaysian court that entered judgment against Defendant had personal jurisdiction over Defendant, which is an element of Plaintiff's claim under the Uniform Foreign Money–Judgments Recognition Act.

gave the parties time to file additional supporting materials.

Subsequent to the December 9th Order, Plaintiff filed an additional resistance to Defendant's motion, and also filed his own Motion for Summary Judgment. Defendant resisted Plaintiff's motion, and filed an affidavit supplementing its August 12th motion.

Currently before the Court are Defendant's Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment. For the reasons detailed below, both motions are denied.

## I. FACTUAL BACKGROUND

### A. Malaysian Judgment

On or about December 31, 1996, Plaintiff filed a Statement of Claim with the High Court of Malaysia at Kuala Lumpur (Commercial Division). On or about that same date, the Malaysian court issued a "Writ of Summons Notice of Which is to be Served Out of Jurisdiction." Defendant PSI was served with the Summons and Statement of Claim on April 21, 1997 at its office in Texas. Plaintiff's claim in the Malaysian court alleged that Defendant breached the terms of two business agreements it had entered into with Plaintiff related to Plaintiff's business activities on behalf of Defendant in Malaysia. PSI contested the Malaysian court's authority to issue a Writ of Summons in Texas, and both parties submitted affidavits in support of their respective arguments regarding personal jurisdiction over PSI in Malaysia. On April 15, 1998, the Malaysian court entered an Order directing PSI to file a defense to Plaintiff's claim within fourteen days. Although PSI appealed the April 15, 1998 Order, the Malaysian court denied the appeal. PSI failed to file a defense after the issuance of the April 15, 1998 Order. On June 23, 1998, judgment was entered by the Malaysian court against PSI in the amount of 2,802,133–00 Ringgits, or approximately $737,306.40.

It is almost impossible to cull a body of undisputed facts from the summary judgment record in this case because the parties appear to disagree about almost every material fact underlying their relationship and potential or actual business dealings in Malaysia. The parties do agree that Plaintiff was employed by PSI in Malaysia from at least August 1992 to February 1995.[2] The parties agree as well that Defendant sent Plaintiff business cards and letterhead that identified Plaintiff as PSI's "Southeast Asia Technical Services Representative," although they disagree about the purpose for which those materials were sent. Finally, Plaintiff and Defendant agree that Plaintiff contacted Defendant in September, 1994 to propose opening a PSI office in Malaysia and that there were preliminary negotiations between the parties about the possibility of Plaintiff opening up a Malaysian office of PSI, though they disagree about the outcome of those negotiations. A May 14, 1995 letter from Plaintiff to Edward Robinson and Terry Wills indicates that effective that date Plaintiff will "discontinue my efforts in representing P.S.I. in Asia" for the following reasons: 1) no start-up funding was provided to Plaintiff; 2) there had been no response from Defendant to the Business Plan sent by Plaintiff in January, 1995; and 3) the agreement between Defendant and Plaintiff had "not been finalized."

With respect to the remainder of Plaintiff and Defendant's relationship and Defendant's contacts with Malaysia, the parties have essentially submitted dueling affidavits. The Court will summarize the parties' respective factual contentions.

---

**2.** Plaintiff argues that he was employed by PSI in Malaysia until May, 1995, but this is disputed by PSI, who argues that his employment ended in February, 1995.

### 1. Plaintiff's Factual Assertions

Plaintiff's affidavit states that his "business relationship" with PSI began in August, 1992 when PSI appointed Plaintiff as its "Associate" in the Southeast Asian region under an agreement entitled "Associate Plan." Plaintiff states that, pursuant to the Associate Plan, he assisted, procured, and obtained directly or indirectly new businesses for PSI in Malaysia. Plaintiff's job duties, according to his affidavit, included recruiting further employment of PSI personnel in Malaysia for several gas plant projects, locating other projects for PSI in and around Malaysia, and compiling contact names and arranging meetings with the contacts in Malaysia. In October, 1992 Plaintiff states that he was appointed as PSI's Project Liaison in Malaysia, which involved compiling time sheets of PSI personnel in Malaysia and submitting the time sheets to PSI at its United States locations. Plaintiff states that Defendant breached the Associate Plan by failing to pay Plaintiff the commissions due and owing under that Plan, forming part of the basis of Plaintiff's action in Malaysia.

Plaintiff's affidavit states that in late January, 1994, Defendant's then president, Terry Wills, and then vice-president, Edward Robinson, traveled to Malaysia and met with Plaintiff to discuss an additional employment agreement, through which Plaintiff was to help PSI establish a Malaysian office in the Southeast Asia region. Plaintiff states that during this visit, Mr. Wills and Mr. Robinson offered to employ Plaintiff in Malaysia on a permanent basis as the Southeast Asia Technical Services Representative for PSI. At some point, Plaintiff received a letter from Terry Wills indicating that "we have taken a first stab for laying the groundwork necessary to establish you as the PSI sales and market-ing representative for Malaysia."[3] The letter included a "proposal ... submitted for [Plaintiff's] comments." Plaintiff's affidavit states that on August 11, 1994, Plaintiff agreed in principle to all 14 terms of the Business Plan offered by PSI and sent back two copies of the finalized Business Plan to Edward Robinson, who acknowledged receipt of the Business Plan and accepted the final Business Plan through telephone calls with Plaintiff in Malaysia.

Plaintiff states that on March 1, 1995, he sent a fax to PSI seeking to confirm PSI's commitment to the Business Plan before expending additional efforts in establishing the Malaysia-based PSI office. On March 2, 1995, Edward Robinson telephoned Plaintiff in Malaysia after receiving Plaintiff's March 1st facsimile and instructed Plaintiff to continue to proceed with setting up the PSI Malaysia office and to conduct business. Specifically, Plaintiff's affidavit states that Mr. Robinson told him, "Get rooted in and go for it!"

Plaintiff has testified through his affidavit, however, that PSI failed to forward any of the start-up funds referenced in the Business Plan and failed to provide the necessary approval for the formation and incorporation of a Malaysia-based office. According to Plaintiff, it was this failure that resulted in his May 14, 1995 letter to PSI. Plaintiff admits in his May 14, 1995 letter to Defendant that he was unsuccessful in obtaining a work permit to do business in Malaysia after the cessation of his employment on the Stone & Webster project, discussed below.

### 2. Defendant's Factual Assertions

Through the affidavit of Edward Robinson, currently the president of PSI, Defendant disputes Plaintiff's characterizations

---

**3.** Plaintiff's affidavit states that this letter was received on August 11, 1994, but the letter itself is not dated.

of its business dealings in Malaysia. Robinson's affidavit asserts that PSI has never set up or maintained an office in Malaysia, does not own and has never owned any property or assets in Malaysia, has never obtained a work permit from Malaysian authorities for any of its employees, has never entered into a contract with a Malaysian company or individual, and generally has never done business in Malaysia. Defendant does, however, acknowledge that as part of its business it leased employees to another corporation, Stone & Webster, who was conducting a project in Kerteh, Malaysia.

Mr. Robinson's affidavit states that Plaintiff was an employee of Defendant who was leased by Defendant to Stone & Webster. As part of this employment, according to the affidavits of Mr. Robinson and Thomas Callahan, Commissioning Manager of Stone & Webster, Plaintiff was appointed by Mr. Callahan as a project liaison to function as a contact person on personnel issues relating to the PSI employees leased to Stone & Webster in Malaysia. According to the Robinson affidavit, the Kerteh project was solely Stone & Webster's project, and Plaintiff's work on the Kerteh project was entirely separate and distinct from the alleged Associate Plan or Business Plan which were the subjects of the Malaysian judgment.

Mr. Robinson states that Plaintiff's work on the Stone & Webster Kerteh project was to be completed in February of 1995, after which time Plaintiff would have been without work in Malaysia. In September of 1994, Plaintiff first contacted Defendant about the possibility of opening an office in Malaysia. Since PSI representatives were already planning a trip to Malaysia in late December of 1994 in order to host a Christmas party for PSI employees leased to Stone & Webster, they agreed to meet with Plaintiff to discuss his proposal during that visit. During those preliminary discussions, according to Mr. Robinson, no commitment was made by either party. Negotiations continued until May of 1995, however the Business Plan terms proposed by Plaintiff were not acceptable to PSI and the negotiations ultimately fell through. The Robinson affidavit states that the terms of the proposed Business Plan were never agreed upon and no contract was ever entered with Plaintiff. Additionally, Mr. Robinson states that "[a]t no time did any negotiations take place between Agnitsch and Process Specialists regarding a so-called 'Associate Plan' as alleged by Agnitsch; no such Associate Plan between Agnitsch and Process Specialists was ever drafted, reviewed, approved or executed by Process Specialists."

Mr. Robinson additionally states that the business cards, letterhead and pamphlets which were sent to Plaintiff in Malaysia were available upon request by any of Defendant's employees working in Malaysia for Stone & Webster. These materials were intended to advertise Defendant. Mr. Robinson states that Plaintiff never used any of those promotional materials to successfully obtain any new business customers in Malaysia for PSI.

Additionally, the Robinson affidavit indicates that neither Plaintiff nor Defendant were at any time authorized to open a PSI office and do business in Malaysia. No foreign corporation or individual is allowed under Malaysian law to do business in Malaysia without affiliating with a formally designated Malaysian citizen. No such citizen was ever obtained and designated by either Plaintiff or Defendant, nor was any legal application ever filed on behalf of PSI seeking the right to do business in Malaysia.

## II. DISCUSSION

### A. The Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be

rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if the dispute over it might affect the outcome of the suit under the governing law. *Id.*

The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), 56(e); *Celotex Corp.*, 477 U.S. at 322–323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 794 (1st Cir.1992) (citations omitted). In order to survive a motion for summary judgment, the nonmoving party must present enough evidence for a reasonable jury to return a verdict in his or her favor. *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505.

On a motion for summary judgment, the Court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *United States v. City of Columbia*, 914 F.2d 151, 153 (8th Cir.1990). The Court does not weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

### B. Discussion

#### 1. Iowa Uniform Foreign Money–Judgments Recognition Act

Iowa's Uniform Foreign Money–Judgments Recognition Act provides that a final and conclusive foreign judgment "is enforceable in the same manner and to the same extent as the judgment of a sister state which is entitled to full faith and credit." Iowa Code § 626B.2. There are, however, certain enumerated exceptions to the Act's provision of full faith and credit to foreign judgments. *See* Iowa Code § 626B.3. Where, for example, the court of the foreign state did not have personal jurisdiction over the defendant, the judgment is not conclusive, and therefore is not subject to the Act's enforcement. Iowa Code § 626B.3(b). Elaborating on personal jurisdiction, Section 626B.4 lists a number of events or circumstances that suffice to establish personal jurisdiction over a defendant in a foreign court, including, *inter alia*, personal service on the defendant in the foreign state, the defendant's voluntary appearance in the foreign proceedings other than to protect seized property or to contest jurisdiction, and the defendant's maintenance of a business office in the foreign state from which business was conducted that forms the basis of the cause of action. Additionally, this sec-

tion provides that a court may recognize "other bases of jurisdiction."

Although a search of Iowa case law failed to reveal any cases that have interpreted Iowa Code § 626B.4(2), the provision that mandates that "other bases of jurisdiction" can be recognized by Iowa courts, courts of other jurisdictions with similar statutory provisions have recognized foreign judgments where the bases of the foreign court's jurisdiction are accepted bases for jurisdiction in the United States and where the exercise of that jurisdiction complies with the requirements of traditional notions of fair play and substantial justice under the Due Process Clause. *Pure Fishing Inc. v. Silver Star Co., Ltd.,* 202 F.Supp.2d 905, 914 (N.D.Iowa 2002) (citing cases from various jurisdictions). Consequently, as both parties agree, the Court's analysis should center on whether the Malaysian court's exercise of personal jurisdiction over Defendant PSI in the Malaysian action complied with traditional notions of fair play and substantial justice under the Due Process Clause. Plaintiff argues that Defendant PSI had minimum contacts in Malaysia such that the exercise of personal jurisdiction over PSI would not offend traditional notions of fair play and substantial justice. Defendant argues that its contacts with Malaysia were insufficient for the Malaysian court to exercise personal jurisdiction over it consistent with the Due Process Clause.

Additionally, Plaintiff argues that personal jurisdiction over Defendant PSI in Malaysia is proper based on Section 626B.4(1)(e), which provides for personal jurisdiction where the defendant had a business office in the foreign state and the proceedings in the foreign court involved a cause of action arising out of business done by the defendant through the office in the foreign state.

It is important to note that, in analyzing the issue of whether the Malaysian court had personal jurisdiction over the Defendant such that its judgment is enforceable under the Iowa Uniform Foreign Money–Judgments Recognition Act, the inquiry is limited to Defendant's contacts in Malaysia and whether Defendant had established a business office in Malaysia. This Court will not examine the underlying merits of the Malaysian action, except to the extent that the facts going to the merits of that action overlap with the facts the Court must examine to determine the issue of personal jurisdiction. In ruling on these motions, the Court expressly declines Defendant's invitation to speculate on the fairness of the result reached by the Malaysian court.[4]

2. Personal Jurisdiction under Iowa Code § 626B.4(2): Minimum Contacts

Iowa's long-arm rule gives Iowa courts personal jurisdiction over "[e]very corporation, individual, personal representative, partnership or association that shall have the necessary minimum contact with the state of Iowa" and indicates that Iowa courts "shall hold such corporation ... amenable to suit in Iowa in every case not contrary to the provisions of the Constitution of the United States." Iowa Rule of Civil Procedure 1.306 (formerly Iowa R. Civ. P. 56.2). This rule allows Iowa courts to exercise jurisdiction to the fullest extent

---

**4.** In its brief in support of the motion to dismiss, Defendant argues that it "is confident that its ultimate analysis will prove to this Court that the Malaysian court proceedings did not comport with fair play and substantial justice. Certainly, without inquiring any further, it should be apparent to any reasonable person that a $1.4 million judgment is incredibly excessive when one considers the activities upon which it purportedly was based, as set forth by Agnitsch in his May 14, 1995 termination letter."

allowed by the federal Constitution. *Larsen v. Scholl,* 296 N.W.2d 785, 788 (Iowa 1980). Consequently, the due process inquiry under Iowa law is whether exercise of jurisdiction over a party comports with the requirements of due process.

 Due process mandates that jurisdiction be exercised only if the defendant has sufficient "minimum contacts" with the forum state, such that summoning the nonresident defendant to the forum state does not offend " 'traditional notions of fair play and substantial justice.' " *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted)). Due process requirements safeguard important liberty interests by ensuring that a defendant is not subject to binding judgments in a forum in which he had not established any meaningful contacts, ties, or relations, and by providing fair warning to defendants about the geographic areas in which their conduct could render them liable to suit. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). "[T]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Id.* (citing *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154). "[I]t is essential in each case that there is some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

Personal jurisdiction may be established over a nonresident defendant through either general or specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). For general juris-

diction to attach, a defendant's contacts with the forum must be "continuous and systematic." *Id.* Specific jurisdiction arises if the defendant "has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King,* 471 U.S. at 472–73, 105 S.Ct. 2174 (citations omitted).

To determine whether a nonresident defendant has sufficient minimum contacts with the forum state for the Court to exercise either general or specific personal jurisdiction, the Eighth Circuit has developed a five-factor test. *Stanton v. St. Jude Medical, Inc.,* 340 F.3d 690, 694 (8th Cir.2003) (citing *Austad Co. v. Pennie & Edmonds,* 823 F.2d 223, 226 (8th Cir. 1987)). Under this test, the Court must consider:

(1) the nature and quality of contacts with the forum state; (2) the quantity of contacts with the forum; (3) the relation of the cause of action to these contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

*Id.* Of the five factors, "the first three factors are of primary importance, and the last two are 'secondary factors.' " *Id.*

a. Specific Jurisdiction

 To establish specific jurisdiction, Plaintiff must show that Defendant purposefully directed its activities at residents of the forum, Malaysia, and that the litigation there resulted from alleged injuries that arose out of or related to those activities. *See Burger King,* 471 U.S. at 472–73, 105 S.Ct. 2174 (citations omitted). It is undisputed that Plaintiff was employed in Malaysia working on Stone & Webster's Kerteh project as a PSI employee. Therefore, Defendant certainly had some contact with Malaysia via its relationship with the

Stone & Webster project it helped to staff in that forum. However, Defendant emphasizes that it is important to distinguish between the two separate and unrelated matters in which Plaintiff was involved in Malaysia: 1) the contract project with Stone & Webster where Plaintiff functioned as project liaison from August, 1992 to approximately February, 1995; and 2) the preliminary negotiations between Plaintiff and Defendant regarding Plaintiff's proposal to open and head a PSI office in Malaysia, undertaken between September, 1994 and May, 1995. Plaintiff's action in Malaysia claimed damages for Defendant's alleged breaches of an Associate Plan and Business Plan purportedly entered into by the parties. While Plaintiff alleges that the Associate Plan was entered into in conjunction with his work on the Stone & Webster project, the copy of the Associate Plan submitted as an exhibit to Plaintiff's affidavit is signed only by Plaintiff. Defendant denies the existence of any Associate Plan, and the Robinson affidavit indicates that Plaintiff was fully compensated for his work on the Stone & Webster project.

Additionally, Plaintiff swears that Edward Robinson acknowledged receipt of the Business Plan and accepted the final Business Plan through telephone calls with Plaintiff in Malaysia. Specifically, Plaintiff states that on March 2, 1995, Edward Robinson telephoned Plaintiff in Malaysia after receiving Plaintiff's March 1, 1995 fax and told Agnitsch to continue to proceed with the set-up of a Malaysia-based PSI office and to conduct business. Defendant, however, denies that there was any such agreement, and Plaintiff's May 14, 1995 letter to Mr. Robinson and Mr. Wills indicates that Plaintiff had received "no response to the Business Plan sent in January."

Both parties as much as admit in their briefing of these summary judgment mo-

tions that this case is not appropriate for summary judgment. Plaintiff's resistance to Defendant's initial motion to dismiss contains the following passage discussing PSI's alleged contacts with Malaysia:

> The affidavit of Edward D. Robinson, filed in support of PSI's Preanswer Motion to Dismiss, claims that PSI 'never entered into a contract with a Malaysian company or individual,' that PSI has 'never done business in Malaysia' and 'does not own, and has never owned, any property or assets in Malaysia,['] and that PSI 'never appointed any representative to set up an office or branch office in Malaysia.' The facts in the record, however, directly refute Edward D. Robinson's statements.

Defendant's brief acknowledges that "[a]ll of the damage claims set forth by Agnitsch in his Statement of Undisputed Material Facts are based on alleged breach of contracts, the existence of which is firmly denied by Process Specialists."

■ In short, the parties appear to agree that the facts most critical to this Court's minimum contacts analysis—namely, the extent and nature of Defendant's contact with the forum state of Malaysia in connection with any business relationship with Plaintiff or plans to enter into a business relationship with Plaintiff—are disputed. The crux of the dispute between the parties over minimum contacts is whether Plaintiff and Defendant ever entered into an agreement whereby Plaintiff would open a PSI business office in Malaysia and conduct business there on PSI's behalf. Whether or not Plaintiff and Defendant in fact entered into an agreement to start an office in Malaysia strikes the Court as one of the most genuine disputes of material fact that could possibly exist under the law of this case.

The Eighth Circuit has made it clear that the five factor minimum contacts test

is "not to be mechanically applied; rather, the facts and attendant circumstances of each case are to be considered." *Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 226 (8th Cir.1987). It is impossible for the Court to conduct the requisite analysis of minimum contacts at the summary judgment stage in this case where the most salient facts regarding the Defendant's contact with the Malaysian forum are disputed by the parties. The summary judgment record reveals that there are genuine factual disputes that must be resolved before the Court can adequately consider whether Defendant PSI had the requisite minimum contacts with Malaysia in the context of this action such that the Malaysian court's exercise of personal jurisdiction over PSI comported with traditional notions of fair play and substantial justice. Though the ultimate decision as to whether the Malaysian court properly exercised personal jurisdiction over Defendant in the action instituted by Plaintiff in Malaysia is a question of law for this Court, making this decision involves evaluating the factual assertions made by both parties regarding PSI's contacts with Malaysia. Although the Court will function as the factfinder in this case, summary judgment is not the appropriate procedural point at which to make findings of fact. For this reason, both parties' motions for summary judgment as they relate to specific jurisdiction are denied.

#### b. General Jurisdiction

The factual disputes that preclude the Court from determining at the summary judgment stage whether the Malaysian court properly exercised specific jurisdiction over Defendant also preclude the Court from determining whether Defendant's contacts with Malaysia were the kind of "continuous and systematic general business contacts" that would support general jurisdiction over Defendant. *See Helicopteros Nacionales*, 466 U.S. at 416, 104 S.Ct. 1868.

#### 3. Business Office in Malaysia

Plaintiff argues that because Defendant PSI had a business office in Malaysia, the Malaysian judgment can be enforced under Iowa Code § 626B.4(1)(e). However, as the record clearly demonstrates, there exists a genuine dispute between Plaintiff and Defendant as to whether PSI in fact had a business office in Malaysia. Put quite simply, the affidavit of Plaintiff asserts that PSI did establish a business office in Malaysia, while the affidavit of Mr. Robinson asserts that Defendant never agreed to establish a business office in Malaysia, nor did it have the necessary governmental approval to establish such an office under Malaysian law. Accordingly, Plaintiff's motion for summary judgment on this ground is denied.

### III. ORDER

For the reasons discussed herein, Defendant's Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment are hereby **denied.**

IT IS SO ORDERED.